UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MELVIN MATSEY,<br>Plaintiff,<br><br>v.<br><br>CITY OF TROY et al.,<br>Defendants. | Case No. 24-10571<br>Honorable Shalina D. Kumar<br>Magistrate Judge Curtis Ivy, Jr. |

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 44, 45, 46, 47)**

## I. Introduction

This case against the City of Troy ("Troy" or the "City") and four individual Troy police officers arises from plaintiff Melvin Matsey's March 2022 arrest for breaking and entering ("B&E"). ECF No. 11. Matsey brings this action under 42 U.S.C. § 1983, asserting defendants violated his rights by arresting him with excessive force and without probable cause. *Id.* Matsey also asserts a claim that defendants violated his Eighth Amendment right to be free from cruel and usual punishment, and brings state law claims of assault and battery, intentional infliction of emotional distress, and gross negligence. *Id*. Defendant officers move for summary

judgment asserting that they did not violate Matsey's Constitutional rights and are entitled to qualified immunity from his claims. ECF Nos. 45, 46, 47. They likewise argue that they are immune from Matsey's state law claims against them. Troy also moves for summary judgment, contending that Matsey failed to state a 42 U.S.C. § 1983 claim against it under *Monell* and that it is immune from Matsey's state claims. ECF No. 44.

Defendants' motions are fully briefed. ECF Nos. 54, 55, 56, 57, 59, 60, 61, 62. The Court has carefully reviewed the briefing and determined that oral argument will not aid in its determination of the pending motions. *See* E.D. Mich. LR 7.1(f)(2). For the following reasons, the Court grants the motions.

## II. Factual Background

In early 2022, multiple law enforcement agencies located within Oakland County participated in a Special Investigations Unit ("SIU"). ECF No. 45-6, PageID.715. The SIU utilized undercover officers and specialized surveillance equipment and techniques to target and apprehend habitual offenders and professional criminals who would otherwise evade detection and arrest. *Id*. The SIU also conducted "surveillance and investigation of suspected breaking-and-entering offenses." ECF No. 47, PageID.1028;

ECF No. 47-2, PageID.1062. Defendants Russell Bragg ("Bragg") and Joseph Morgan ("Morgan") were members of the SIU with Bragg assigned as the SIU supervisor.[1]

On February 12, 2022, Morgan received a phone call from a Plymouth Police Department detective informing him that he was investigating Matsey for a B&E at a local business in which two Apple iMac computer monitors were stolen. ECF No. 46-10, PageID.941. The Plymouth officers believed that a rock was used to shatter the glass interior door, and it was discovered that the same business had been the victim of three prior unsolved burglaries in 2010 and 2011 where the suspect "would break glass and steal only computer components." ECF No. 46-5, PageID.845.

Bragg was familiar with Matsey from previous investigations in the early to mid-2000s, and knew his modus operandi ("MO") was to smash entry doorways or windows with a large rock and steal computer equipment. ECF No. 46-10, PageID.941. Matsey was a known commercial burglary suspect with multiple burglary-related convictions as of 2007. *See*

[1] Throughout this Opinion, Bragg, Morgan, and the other two individual defendant officers, Nicholas Hill ("Hill") and Jeffrey Clemence ("Clemence") are referred to collectively as the "SIU officers."

ECF No. 47-4. Likewise, the Plymouth detective identified Matsey as a suspect for its most recent burglary after a review of the department's records showed that he had previously been arrested for a B&E in the same complex. ECF No. 46-5, PageID.846. Plymouth police identified Matsey's vehicle as a 2013 red Chevy Malibu with silver wheels, tinted windows, and a sunroof. *Id* at PageID.845. Because recent break-ins in the Plymouth area involved a vehicle matching that description, a GPS tracking device was placed on Matsey's vehicle pursuant to an executed search warrant. *Id.* at PageID.846; ECF No. 46-6.

The Plymouth detective alerted Bragg that, according to the tracking device, Matsey appeared to be casing businesses in Troy. ECF No. 46-10, PageID.941. SIU picked up surveillance of Matsey's vehicle and determined Matsey had visited various commercial properties in Troy, including a software company on Ring Drive and a physical therapy clinic at 2605 Crooks Road. *Id*. at PageID.941–42. SUI obtained surveillance video from 2605 Crooks, which revealed Matsey peering through windows of closed businesses, carrying a flashlight, and avoiding surveillance cameras. *Id.* at PageID.942. Intermittent live surveillance and electronic monitoring of Matsey's vehicle over the ensuing weeks revealed that he

returned to the 2605 Crooks address three more times. Each visit occurred shortly after dark when the clinic was closed. *Id*.

During the weekend of February 27, 2022, the software company located on Ring Drive was burglarized, reporting roughly $6,000 of computer equipment stolen (the "Ring Drive Burglary"). *Id*. Electronic surveillance confirmed that, on the evening of February 26, 2022, while businesses were closed, Matsey's vehicle was parked approximately 80 feet from the site of the Ring Drive Burglary for approximately eight minutes. *Id*.

On March 8, 2022, officers observed Matsey driving through commercial areas in Troy, including the parking lot of the clinic at 2605 Crooks Road, as well as Royal Oak and Southfield, occasionally stopping to peer into windows and pull locked door handles of various closed businesses. *Id*. at PageID.942–43.

Matsey returned to 2605 Crooks Road on March 9, 2022, parking at the far west end of the lot and walking east toward the main entrance of the clinic. After several minutes of walking around the business, Matsey returned to his vehicle and drove away. *Id*. at PageID.943. Matsey drove through several business parking lots, and up and down several streets

without stopping, before parking in the lot of another closed physical therapy clinic on East Maple Road. *Id*. Bragg observed Matsey walking through the lot toward a neighboring closed business. Matsey disappeared from view for the next 15 minutes. *Id*. Bragg next saw Matsey sprinting back through the physical therapy building's parking lot with something large tucked under his right arm. *Id*. As he ran toward his car, its headlights illuminated, allowing Bragg to see Matsey clearly. *Id*. Matsey entered his car and travelled west on Maple Road. *Id*. SIU officers followed Matsey's vehicle and, at the intersection of Maple Road and Coolidge Highway, performed a box-in maneuver to immobilize his vehicle so that they could arrest him. *Id*.

Because Matsey's car door was blocked by a police vehicle, SIU officers helped Matsey exit his vehicle through the driver side window. Matsey alleges in his first amended complaint ("FAC") that he was forcibly removed from his car through his window and dropped to ground with such force that he broke his shoulder. ECF No. 11. He also alleges that he sustained injuries to his neck and back as result of his forced removal from his vehicle. *Id*.

However, Bragg's body camera footage shows officers holding Matsey's hands supporting him as he eased his body out of the car's window. ECF No. 47-5. Matsey cleared the car at time stamp 3:35 of the body cam footage. *Id*. at 3:35. Morgan and Clemence assist him as his second foot comes out of the window. *Id*. Just before he passes out of the view of Bragg's body cam, Matsey is visibly upright still within the officer's grasp. *Id*. Bragg moved around a police vehicle to return Matsey to view. *Id*. at 3:35–3:43. Both assisting officers and Matsey are standing, with no indication of lifting or rising from a crouched or collapsed position. *Id*. at 3:43–3:49. Matsey's face appears calm; at no point in the video can he be heard shouting or speaking. *Id*. at 3:10–4:08.

Matsey was then placed under arrest and taken to the Troy police station. An inventory of his vehicle turned up two pairs of gloves and a bolt cutter; Matsey was in possession of a small flashlight at the time he was arrested. ECF No. 46-10, PageID.943.

During the booking process, Matsey asked to speak to a detective. Bragg and Morgan met with Matsey, who immediately waived his Miranda rights (which were read to him verbatim from a form). *Id*. Matsey denied any involvement in recent burglaries matching his known MO. Bragg told

Matsey his license plate had been captured on CCTV near the scene of a burglary, and without further information, Matsey explained that he stopped to urinate in the parking lot of a business near Oakland Mall when he heard a building alarm go off. *Id*. Concerned that responding police might suspect his involvement in whatever triggered the alarm, he immediately left the area. *Id*. at PageID.944. The police report notes that the area described by Matsey is where Ring Drive is located. *Id*. When asked about his repeated trips to 2605 Crooks Road, Matsey explained that he was checking if the physical therapy clinic accepted his insurance. He could not explain how he expected to gather that information when the clinic was closed or why he appeared to be avoiding the view of surveillance cameras when he noticed them. *Id*.

Matsey then explained his erratic movements prior to his arrest as an effort to flush out what he believed to be insurance investigators surveilling him as part of a civil lawsuit for injuries he sustained as the result of a slip and fall. *Id*.; ECF No. 47-7, PageID.1164. Accordingly, he had paid attention to other cars around him and accurately described two of the SIU vehicles that had been following him. Matsey told the detectives he exited his vehicle and hid in bushes near a business facing Maple Road so that he

could watch passing vehicles. *Id*. at PageID.1168–69. He then wadded up his jacket and ran back to his car to illicit a response from those he suspected of following him and verify his suspicions. *Id*.

Matsey was released, and no charges were filed. Matsey alleges he was detained for at least five hours but the police report notes that Matsey was taken into custody sometime shortly before 9 p.m., and a prisoner property record reflects that property taken from Matsey following his arrest was released at 11:57 p.m., suggesting that Matsey was detained for around three hours. ECF No. 46-10, PageID.959, 968.

## III. Analysis

### A. Standard of Review

Summary judgment is appropriate where the evidence in the record, viewed in its entirety, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "The moving party bears the burden of showing that no genuine issues of material fact exist." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516–17 (6th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986)). In reviewing a motion for summary judgment, courts are to "view the factual evidence and draw all reasonable

inferences in favor of the non-moving party." *Williams v. Mauer*, 9 F.4th 416, 430 (6th Cir. 2021) (citation omitted). The ultimate question for the court to determine "is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne v. Novartis Pham. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)).

When events at issue are captured on video, courts are to "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). But if the video evidence "can be interpreted in multiple ways or if [the] videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). Viewing the facts in this manner, if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment should be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56.

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams*, 9 F.4th at 430 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity at the summary judgment stage applies "unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Id*. (citation omitted); *see also Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659–60 (6th Cir. 2021). If defendants raise qualified immunity on summary judgment, the plaintiff bears the burden of showing that a defendant is not entitled to it. *Williams*, 9 F.4th at 430 (citing *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011)).

Although on summary judgment this Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party, a properly raised defense of qualified immunity places the burden on the plaintiff to show that those facts and inferences would allow a reasonable juror to conclude that the defendant violated a clearly established

constitutional right. *Id*. at 430–31 (citing *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020)).

**B. Federal Claims**

**1. False Arrest Claim**

"A warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Ouza v. City of Dearborn*, 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152. "[T]he existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Brown v. Knapp*, 75 F.4th 638, 647 (6th Cir. 2023) (quotation marks omitted) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000)).

"To determine whether an officer had probable cause for an arrest, [the court] examine[s] the events leading up to the arrest, and then decide[s] whether [those] historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of*

*Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (quotation omitted). "Judged from that perspective, the 'facts and circumstances within the officer's knowledge' must be 'sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " *Green v. Perkins*, 2026 WL 373038, at *5 (6th Cir. Feb. 10, 2026) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Probable cause is not a high hurdle: "it requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 583 U.S. at 57.

The facts of the record before the Court permit only one reasonable determination—that the defendant SIU officers reasonably concluded that they had probable cause to arrest Matsey. As laid out in detail above, the Plymouth police department alerted the SIU officers that Matsey was tracked to Troy, and his movements suggested the casing of potential targets for burglary. ECF No. 46-10, PageID.941. SIU officers were familiar with Matsey, a habitual offender with multiple B&E convictions and an MO of using a rock to smash through a closed business's window or glass door to steal computer equipment. ECF No. 46-9, PageID.927; ECF No. 46-10, PageID.941. Plymouth's tracking information showed Matsey's vehicle

within 80 yards of the weekend Ring Drive Burglary, which matched Matsey's MO, the night before it was discovered and reported. *Id*. On this information, a magistrate judge found probable cause to issue a warrant for SIU to place its own tracking device on Matsey's vehicle. *See* ECF No. 46-9.

Continued SIU surveillance revealed that on March 8, 2022, the day before he was arrested, Matsey cruised industrial and commercial office areas in Troy and other nearby suburbs, "frequently stopping for short periods of time behind buildings and out of sight from the main roads the closed businesses" fronted. ECF No. 46-10, PageID.943. During this time, Matsey was observed on foot peering into windows and pulling on locked doors of closed businesses in Southfield. *Id*.

The following night, after Matsey was observed in the oft-visited 2605 Crooks Road parking lot, he was further observed weaving and looping around back lots of closed Troy businesses. He parked at the physical therapy building on East Maple Road and disappeared on foot for 15 minutes before sprinting back to his car with a large object under his arm. This erratic and highly suspicious conduct gave defendant SIU officers ample probable cause to believe Matsey had just committed a crime.

Matsey resists this conclusion by arguing questions of fact preclude a finding of probable cause because “no burglary had been confirmed, no alarm had been triggered, no break-in had been reported. . ., and officers ultimately found no evidence of a crime.” ECF No. 61, PageID.1665. This argument ignores the principle that “[p]robable cause requires only ‘a probability or substantial chance of criminal activity, not an actual showing of such activity.’” *Brown v. City of Albion*, 136 F.4th 331, 342 (2025) (quoting *Wesby*, 583 U.S. at 57). “Probable cause in the end requires just that: probability, not certainty.” *Henderson v. Village of New Holland*, ___ F.4th ___, 2026 WL 2276895, at *4 (6th Cir. Aug. 7, 2026).

Additionally, the absence of a triggered alarm, a report of a break-in, or any other confirmation of an actual burglary does not create a genuine question of fact relative to probable cause. The Ring Drive Burglary (of which Matsey was also suspected), that occurred on a weekend, did not trigger any alarms, and was not reported until discovered some hours or even over a day or more after it occurred. The physical therapy business Matsey ran and then drove away from may not have had a functioning alarm. And, at the time of Matsey’s arrest, just minutes after he drove away, the business was closed; any break-in or theft was not likely to be

discovered or reported by the building's occupants until the following morning. Nor would the officers who pursued Matsey's vehicle have had an opportunity to have inspected (or have called for other officers to investigate) the scene for evidence of a burglary. Given the suspicious activity observed directly by the arresting officers and the surrounding circumstances—like Matsey's history, the SIU officers' surveillance of Matsey in the preceding weeks and days, and their investigation of the Ring Drive Burglary fitting his known MO—the absence of immediate and definitive confirmation of a burglary does not inject a genuine issue of material fact as to the existence of probable cause.

Furthermore, even if there were any doubt whether the defendant SIU officers had probable cause under the law to arrest Matsey for burglary, they would be entitled to qualified immunity for Matsey's false arrest claim because the absence of probable cause under similar circumstances has not been clearly established. *See Green*, 2026 WL 373038, at *6. "Specificity is especially important" for clearly establishing the absence of probable cause in fringe cases "because officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered." *Id*. (quoting *Wesby*, 583 U.S. at 64) (quotation

marks omitted). To overcome a defendant's assertion of qualified immunity, a plaintiff must "identify a case where an officer acting under similar circumstances. . .was held to have violated the Fourth Amendment." *Ouza*, 969 F.3d at 280 (quoting *Wesby*, 583 U.S. at 64). Matsey has not identified any case in which officers, who arrested a surveilled suspect observed acting in a furtive manner simulating the very crime of which he was suspected, were found to have done so without probable cause. To the contrary, "the Supreme Court has made clear that probable cause does not require officers to rule out innocent explanation for suspicious facts." *United States v. Santiago*, 139 F.4th 570, 575 (6th Cir. 2025) (internal quotation marks omitted). Accordingly, even if the SIU officers lacked probable cause to arrest Matsey, they are protected by qualified immunity and thus entitled to summary judgment of Matsey's false arrest claim.

**2. Excessive Force Claim**

Matsey also asserts that the SIU officers' actions in taking him into custody amounted to unjustifiable excessive force in violation of his Fourth Amendment rights. In their motion for summary judgment on this claim, the SIU officers rely on the video and audio from Bragg's body camera to

demonstrate that the SIU officers did not use excessive force in taking Matsey into custody. ECF No. 46-9.

Matsey's FAC alleges that he "was forcibly grabbed by the wrists and dragged through the window of his vehicle." ECF No. 11, ¶ 28. He claims that as he was stretched horizontally and almost completely out of the car when he was dropped to the ground with such force that it broke his shoulder. *Id*. at ¶ ¶ 29–30. These allegations are not supported by the video evidence.

The video evidence clearly shows Morgan grasp Matsey's outstretched hands as Morgan directs Matsey to come out his window. ECF No. 47-5, at 3:24. Morgan tells Matsey, "let me help you out," as Morgan holds Matsey's extended arms and Matsey uses Morgan's braced arms as leverage for pulling his upper body out of the car window. *Id*. at 3:26–3:31. With his upper body out of the car, Matsey begins to inadvertently honk the horn of the car with his legs. *Id*. Clemence, the SIU officer standing slightly behind Morgan, reaches out to help stabilize Matsey by holding his right arm. *Id*. at 3:31–3:32. As the officers brace and guide Matsey, his momentum carries him forward until his right knee clears the window, followed by his right foot and immediately his left foot. *Id*. at

3:33–3:35. Matsey's legs are obscured from the camera's view because a police vehicle remains between Bragg and Morgan, Clemence, and Matsey. *Id*. Bragg begins to walk around that police vehicle to regain a view of Matsey and the other officers. *Id*. at 3:35–3:43. Just before Bragg moves completely behind the obscuring vehicle, Matsey's head, left shoulder grasped by Morgan, and the left portion of his torso are visibly upright, parallel to the standing Morgan. *Id*. at 3:35. When Bragg's camera next shows Matsey, eight seconds later, Matsey is clearly standing on the ground, with Clemence standing directly behind him, holding both of Matsey's arms behind his back. *Id*. at 3:43. Morgan and Clemence appear to be in the process of handcuffing Matsey. *Id*. at 3:43–3:46. The posture and positions of Matsey, Morgan, and Clemence give no indication that a dramatic fall resulting in a significant injury had just occurred. *Id*. at 3:46.

The audio is also not consistent with Matsey's claim. Notably, the audio during the eight seconds Matsey was not on camera contains no shouting, exclamations, cries of pain, or sounds of scuffling. *Id*. Even more remarkably, Matsey's facial expression is relaxed, and he appears unruffled, just seconds after the alleged injury-provoking fall. *Id*. at 3:49, 3:58–3:59.

Because the facts viewed (and heard) in the light depicted by Bragg's body camera do not support Matsey's allegations against the SIU officers, they are entitled to summary judgment in their favor on his excessive force claim.

### 3. *Monell* Claim

To establish municipal liability under *Monell*, "a plaintiff must prove: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance of or acquiescence to federal rights violations." *Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019) (internal quotation and marks omitted). The FAC advances a claim for the City's liability under a failure to train or supervise theory. ECF No. 11, ¶ 47.

"To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ouza*, 969 F.3d at 286–287 (quoting *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).

As the court explained in *Ouza*, there are "at least two situations in which inadequate training could be found to be the result of deliberate indifference." *Id.* at 287 (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)). First, a plaintiff can demonstrate deliberate indifference by showing that the municipality has failed to act "in response to repeated complaints of constitutional violations by its officers." *Id*. (citation omitted). Second, in a "narrow range of circumstances," a plaintiff can show that a municipality was deliberately indifferent with a single incident. *Connick*, 563 U.S. at 63. Although rare, the unconstitutional consequences of failing to train can be so patently obvious that a municipality could be liable under § 1983 without proof of a pre-existing pattern of violations. *Id*. at 64.

Matsey does not argue and offers no evidence that the City has shown deliberate indifference by failing to act "in response to repeated complaints of constitutional violations by its officers." *Ouza*, 969 F.3d at 287. To the extent Matsey argues that this single incident fits within that "narrow range of circumstances" that permit a plaintiff to establish a municipality's deliberate indifference without proof of a pre-existing pattern of violations, he misses the mark.

Unlike in *Ouza*, where it was not disputed that the defendant officers had received no training, when officers have been afforded some training, the Sixth Circuit has held that a plaintiff must show that the municipality, "through its policymaker(s), was on notice that, absent additional training, it was so highly predictable" that law enforcement would engage in unconstitutional conduct "as to amount to conscious disregard for citizens' rights." *Harvey v. Campbell Cnty.*, 453 F. App'x 557, 568 (6th Cir. 2011); *see also Williams v. City of Oak Park*, 2021 WL 3566281, at *9 (E.D. Mich. Aug. 12, 2021). Matsey has made no such showing.

Additionally, the Sixth Circuit foreclosed the argument that a single incident is enough to establish deliberate indifference if a plaintiff fails to provide any evidence that would support an inadequate training or supervision claim beyond his own experience with the police officers. *See Simer v. Oakland Cnty.*, 761 F. Supp. 3d 1000, 1010–11 (E.D. Mich. 2024) (citing *Ouza*, 969 F.3d at 286). Matsey points only to the SIU officers' actions against him during his arrest to support his failure to train or supervise claim against the City. Matsey has thus failed to demonstrate the existence of a policy of inadequate training or supervision as a basis for the

City's liability under *Monell*. The City is therefore entitled to summary judgment on his claim against it.

#### 4. Eighth Amendment Claim

Matsey's FAC also alleges that defendants' actions against him violated his Eighth Amendment right to be free from cruel and unusual punishment. *See* ECF No. 11, ¶ ¶ 64–67. Well-established law, however, applies the protections of the Eighth Amendment only to convicted criminals and not to pretrial detainees, such as Matsey. *See Greene v. Crawford Cnty.*, 22 F.4th 593, 605 (6th Cir. 2022) (citing *Graham v. Washtenaw Cnty.*, 358 F.3d 377, 382 n.3 (6th Cir. 2004)). Accordingly, summary judgment in favor of defendants is appropriate.

### C. State Claims

Title 28 U.S.C. § 1367 authorizes federal courts to exercise supplemental jurisdiction. A court has the discretion to decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are

other compelling reasons for declining jurisdiction. Because the Court is dismissing all claims over which it has original jurisdiction, it declines to exercise supplemental jurisdiction over the state law claims. These claims are dismissed without prejudice.

## IV. Conclusion

For the reasons discussed, the Court **GRANTS** defendants' motions for summary judgment. ECF Nos. 44–47. The FAC's (ECF No. 11) federal claims against all defendants are **DISMISSED WITH PREJUDICE**.

The Court **FURTHER ORDERS** that Matsey's state law claims are **DISMISSED WITHOUT PREJUDICE**. This case is now closed. A separate judgment will issue.

**IT IS SO ORDERED**.

s/ Shalina D. Kumar
SHALINA D. KUMAR
United States District Judge

Dated: September 18, 2026